FILED - USDC -NH
2022 AUG 12 AM 11:41

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEWHAMPSHIRE

ARTHUR JONES, JR.,

      Plaintiff,

       vs.

UNITED STATES OF AMERICA

      Defendant

NO. _____

COMPLAINT FOR

DAMAGES

COMPLAINT FOR DAMAGES

( Negligence )

JURY DEMANDED

Jurisdiction and Venue

1. The Court has jurisdiction under 28 U.S.C. §1331 and the Federal Tort Claims Act.

2. On ___June 1, 2021___, plaintiff submitted an Administrative Claim on Form _____, Claim for Damage, injury, or Death, to the United States _Federal Bureau of Prisons_, Department of ___Justice___. This Claim was denied on ___February 23, 2022_.

1.

3. Plaintiff is an inmate (prisoner) of the Federal Bureau of Prisons (FBOP), Federal Correctional Institution (FCI, Berlin, New Hampshire.

4. Defendant United States of America is sued under the Federal Tort Claim Act for negligence by FBOP Correctional Officers.

5. Defendants Robert Hazelwood, Warden, T. Steals, Assistant Warden, D. Ramierz, Assistant Warden, _____, Clinical Director, T. Cinkovich, Health Service Administrator, Mrs. Recon, Nurse, Mrs. Girard, Nurse, A. Lavoie, Correction Officer and A. McCormick, Lieutenant, was, at all relevant times, employees and officers of the FBOP, Department of Justice, an agency of the United States of America.

## Facts

6. On April 9, 2021, at approximately 7:00 AM, the plaintiff sat beside inmate (I/M) Jaiden Paige #05639-089 at his (I/M Jaiden Paige) assigned cell #130 located in Unit A-1 of FCI Berlin. I/M Jaiden Paige was waiting to be called into work at FCI Berlin Commissary. However, I/M Jaiden Paige was noticeably sick, weak and incoherent at times. The plaintiff asked I/M Jaiden Paige was something wrong? I/M Jaiden Paige incoherently informed the plaintiff that he was very sick and weak. The plaintiff then encouraged I/M Jaiden Paige to seek medical attention. I/M Jaiden Paige told the plaintiff that he believed he contracted Covid-19 and that he went to medical on two (2) separate occassions seeking medical attention and was told by Mrs. Recon, Nurse, on the first occassion that she would place him on call-out to see medical staff and on the second occassion Mrs. Recon, Nurse, told him there was no one available at the facility to test him for Covid-19 in response to I/M Jaiden

Paige informing her that he believed he contracted COVID-19.

7. On April 9, 2021, the plaintiff immediately informed B. Paige, Correctional Officer (C/O) that I/M Jaiden Paige needed medical assistance. C/O B. Paige after talking to I/M Jaiden Paige contacted medical staff and approximately twenty (20) minutes thereafter I/M Jaiden Paige was told by C/O B. Paige to go to medical. Approximately thirty (30) minutes thereafter, C/O B. Paige announced an emergency lock down of all inmates housed in Unit A-1. The plaintiff complied and was secured in cell #203.

8. On April 9, 2021, I/M Jaiden Paige was tested for COVID-19 and his test result was positive. I/M Jaiden Paige was placed in the quarantine unit. There were several other inmates including I/M D. Horton #66331-060 and I/M James Edwards #-038 who worked with I/M Jaiden Paige in the commissary. Initially when C/O B. Paige announced the emergency lock down of all inmates in Unit A-1, the remaining three (3) inmate commissary workers were placed into Unit A-1 activity room and secured due to having came into contact with I/M Jaiden Paige who had tested positive for COVID-19. However, approximately fifteen (15) minutes thereafter those three (3) inmate commissary workers were allowed to return to their assigned cells in Unit A-1 rather than being taken into issolation.

9. On April 10, 2021, or approximately there to Mrs. Recon, Nurse, and Mrs. Girard , Nurse, among other medical staff conducted COVID-19 testing on all inmates housed in Unit A-1. From April 10, 2021, through April 13, 2021, the vast majority of inmates tested positive for COVID-19. The inmates that tested positive for COVID-19 were placed in the quarantine units, but their cell mates and other inmates who came into contact with them were left in the housing unit rather than placed in isolation.

3.

10. On April 10, 2021, through April 13, 2021, all inmates housed in Unit A-1 were allowed fifteen (15) minutes of shower time. Although during this time frame it was clear that multiple inmates were testing positive for COVID-19 and placed in the quarantine unit, there were several other inmates who had direct contact with those inmates who tested positive for COVID-19 such as their cell mates who was allowed to remain in Unit A-1. Consequently, the failure to isolate those particular inmates who came into direct contact with inmates who were known to test positive for COVID-19 created an unsafe enviornment, because those inmates were allowed to take showers in the unit that other inmates had to use. The plaintiff did not have the ability to clean and sanitize the shower before use, because he was restricted from going anywhere other than the shower and fifteen (15) minutes was not enough time to clean the shower and shower afterwards. As a result, COVID-19 spreaded through out the inmate population in Unit A-1 through the use of the showers as well.

11. On or about April 11, 2021, the plaintiff's cell mate complained to Mrs. Girard , Nurse, during which time medical staff were conducting tempature checks of all the inmates left in Unit A-1 that he felt sick and should be given a COVID-19 test. Mrs. Girard , Nurse, gave plaintiff's cell mate whose name and register number is I/M M. Kelly #17765-021 a rapid COVID-19 test that showed he was positive for the virus. Again, I/M M. Kelly #17765-021 was placed in the quarantine unit, but Mrs. Nurse, failed to give a COVID-19 test or have the plaintiff placed in the isolation unit due to having had contact with I/M M. Kelly.

12. On April 13, 2021, approximately between the hours of 6:30 PM and 8:00 PM I/M Joseph Rijo Santiago # 64789-050 activated his inmate duress alarm from his assigned cell # 114 in Unit A-1. After assessing the reason why I/M

4.

J. R. Santiago activated his duress alarm, C/O A. Lavoie informed Lieutenant H. Condit and Case Manager Mrs. D. Shuler that I/M J. R. Santiago had made a request to be seen by medical staff due to it being hard for him to breath. Lieutenant H. Condit told I/M J. R. Santiago that medical staff does not work in the institution at night.

13. On April 13, 2021, between the hours of 7:00 PM and 8:00 PM the plaintiff begain to exprience weakness and shortness of breath. As a result, the plaintiff activated his inmate duress alarm from his assigned cell #203. C/O A. Lavoie responded by coming to the cell door and asking the plaintiff what was the problem. The plaintiff informed C/O A. Lavoie that he was feeling very weak and short of breath. Furthermore, the plaintiff informed C/O A. Lavoie that he felt really wired and was having trouble standing up. Additionally, the plaintiff informed C/O A. Lavoie that he had not eaten all day due to fasting in observance of Ramadan. The plaintiff informed C/O A. Lavoie that he needed to speak with the lieutenant about his health concerns, because the plaintiff was well aware that medical staff do not work in the institution at night. Therefore, the plaintiff understood that the lieutenant was task with making any medical decisions in the absence of medical personel. C/O A. Lavoie responded no! The plaintiff said no". Being confused as to the officer's response. The plaintiff then made it very clear to C/O A. Lavoie that he needed to see medical. In a high pitched voice the plaintiff requested C/O A. Lavoie to please call medical three (3) times in succession. C/O A. Lavoie walked away from the door and he failed to call medical or the lieutenant.

14. On April 14, 2021, the plaintiff was served with an incident report written by C/O A. Lavoie. Lieutenant A. McCormick served plaintiff the incident report. Lieutenant

A. McCormick asked the plaintiff did he want to make a statement. The plaintiff informed Lieutenant A. McCormick that he activated the inmate duress alarm because he was sick and still felt sick at that present moment. Lieutenant A. McCormick then begain screaming at the plaintiff that he was going to have the plaintiff placed in the Special Housing Unit (SHU) due to the plaintiff varbally complaining to him about CIO A. Lavoie not calling the lieutenant or medical to help the plaintiff. Although the plaintiff repeated to Lieutenant A. McCormick that he still felt sick at that moment, Lieutenant A. McCormick failed to address the plaintiff's medical needs.

15. On April 14, 2021, several hours after Lieutenant A. McCormick served the plaintiff with the incident report, Mrs. Girard, Nurse, came around the unit to perform COVID-19 test on the remaning approximately twelve (12) inmates including the plaintiff who at that time had yet to test positive for the COVID-19 disease. The plaintiff informed Mrs. Girard, Nurse, that he felt wired. Mrs. Girard, Nurse, looked at the plaintiff and then administered the COVID-19 test.

16. On April 14, 2021, several hours after Mrs. Girard, Nurse, tested the remaining twelve (12) inmates from Unit A-1 they, including the plaintiff, were removed from the unit and placed in Unit B-3 due to exposure or precautionary quarantine.

17. On April 15, 2021, the plaintiff's condition persisted as he became increasingly weaker and shorter of breath. The plaintiff informed Mrs. Recon, Nurse, who had entered Unit B-3 to conduct further COVID-19 testing of the inmates placed in that housing unit due to being exposed to the virus that he needed to know what his COVID-19 test results were from April 14, 2021. Mrs. Recon, Nurse, explained to the plaintiff that the COVID-19 test he took

6.

on April 14, 2021, will take several days to be analiced and returned to the institution. The plaintiff then informed Mrs. Recon, Nurse, that he felt very weak and that it was very hard for him to breathe. Mrs. Recon, Nurse, alerted the plaintiff that he may have Covid-19 and that the plaintiff needed to take a Covid-19 rapid test. The plaintiff did took a Covid-19 rapid test administered to him by Mrs. Recon, Nurse, and the test result was positive for Covid-19.

18. On April 15, 2021, after a few hours had passed since the plaintiff tested positive for Covid-19, he was removed from Unit B-3 and placed in Unit C-4 to quarantine.

19. Between April 17, 2021, and April 26, 2021, Mrs. Girard, Nurse, provided the plaintiff with an inhaler to help him with his breathing complications.

20. On or about April 19, 2021, the plaintiff was finally able to speak with Mrs. T. Steals, Assistant Warden, and D. Ramierz, Assistant Warden, because prior to such time the excutive staff never came to the units. The plaintiff informed them that FCI Berlin staff failed to follow the Center for Disease Control (CDC) guidelines for contact tracing and isolation to prevent the dangerous spread of Covid-19 among the inmate population. The plaintiff explained to the Assistant Wardens of the events that unfolded from April 9, 2021, through April 19, 2021, as documented in this Complaint. Mrs. T. Steals, Assistant Warden, told the plaintiff that FCI Berlin staff do not follow CDC guidelines.

21. On April 26, 2021, after ten (10) days of the plaintiff being placed in the quarantine unit he was removed and placed in the Special Housing Unit (SHU) in a cell on E-Range. The plaintiff's cell mate in the SHU was I/M J.R. Santiago who, too, was taken to the SHU from the quarantine unit.

7.

22. On May 13, 2021, the plaintiff was found guilty by the Disciplinary Hearing Officer (DHO) for violating Prohibited Act Code 208 (Improperly using a security device). To no avail, the plaintiff submitted a written statement to the DHO detailing the events that transpired between April 13, 2021, through April 15, 2021, that demonstrated the plaintiff was positive for COVID-19 when he activated his inmate duress alarm from Cell #203 of Unit A-1 and that the plaintiff requested inmate witnesses such as I/M C. Hill #62100-060 and I/M T. Jefferies #68662-066 who testified that the plaintiff requested medical assistance.

23. NO Federal Bureau of Prisons (FBOP) employee or medical staff member made any attempt to conduct any contact tracing for the purpose of isolating those inmates to prevent the spread of the COVID-19 virus among the inmates housed in A-1 Unit. As a result, over one hundred and fifty (150) inmates including the plaintiff contracted the COVID-19 virus.

24. On October 16, 2020, FCI Berlin exprienced its first positive commercial lab test results for two unknown FCI inmates who were housed in the quarantine unit and placed in isolation. Mr. R. Hazlewood, Warden, assumed his duty of care in preventing the spread of the COVID-19 virus among the inmate population by ensuring that an institutional recall of all inmates was exercuted to conduct contact tracing and to perform additional testing of inmates.

25. On October 22, 2020, it was determined that eight (8) inmates tested positive for the COVID-19 virus. Due to FCI Berlin employees early and diligent recognization that two (2) inmates contracted the COVID-19 virus and proceeded to conduct contact tracing substantially minimised the spread of the COVID-19 virus among the inmate population.

8.

## Common-Law Negligence Claims Against United States
## (FTCA)

26. "To recover for negligence under New Hampshire law," "a plaintiff must show that the defendant owes a duty to the plaintiff and that the defendant's breach of that duty caused the plaintiff's injuries." Christen v. Fiesta Shows, Inc., 170 N.H. 372, 375, 173 A.3d 162 (2017); Laramie v. Sears, Roebuck & Co., 142 N.H. 653, 655, 707 A.2d 443 (1998) (stating that, to prove negligence, a plaintiff must show "that the defendant owed the plaintiff [] a duty, the duty was breached, that the plaintiff [] suffered an injury, and that the defendant's breach was the proximate cause of the injury."). See Schlis v. Target Corp. 2021 U.S. Dist. LEXIS 66152, pg. 5

27. The actions of Warden Robert Hazlewood as set forth in paragraph 16 constitute negligence in violation of New Hampshire law. The warden had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff, a prisoner at FCI Berlin, from exposure to the CovID-19 virus which was known to or which might reasonably be apprehended by him. See 18 U.S.C. §4042. The warden failed to exercise reasonable care and diligence to protect the plaintiff from exposure to COVID-19, because it took the Warden from April 9, 2021, the date of the first positive COVID-19 case involving I/M Jaiden Paige as set forth in paragraph 6, to begin isolating inmates on April 14, 2021, when plaintiff was removed from Unit A-1 and placed in Unit B-3 due to exposure to the CovID-19 virus. See FCI Berlin Inmate Bulletin CovId-19 Update April 15, 2021.

28. The actions of Assistant Warden T. Steals and Assistant Warden D. Ramierz as set forth in paragraph 20 Constitute negligence in violation of New Hampshire law. The assistant wardens had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff from exposure to the CovID-19 virus which was known to or which

9.

might reasonably be apprehended by them. See 18 U.S.C. §4042. The assistant wardens failed to exercise reasonable care and diligence to protect the plaintiff from exposure to COVID-19, because it should have been reasonably apprehended by them that starting on April 9, 2021, that a COVID-19 outbreak begain with a positive COVID-19 test administered to ILM Jaiden Paige. However, it was not until April 19, 2021, approximately ten (10) days later that the assistant wardens responded to the widespread COVID-19 outbreak among the inmate population when they decided to take a tour of the quarantine units. Nevertheless, by the time the assistant wardens made their tour of the quarantine units to inquire of the inmates positively affected with the COVID-19 virus, over one hundred and fifty (150) inmates, including the plaintiff, had tested positive for COVID-19. The plaintiff informed the assistant wardens that when he felt sick he activated his inmate duress alarm and recieved an incident report from C/O A. Lavoie even though he was sick with COVID-19. Furthermore, the plaintiff informed the assistant wardens that FCI Berlin staff failed to follow the Center for Disease Control (CDC) guidelines for contact tracing and isolation to prevent the dangerous spread of COVID-19 among the inmate population. Assistant Warden T. Steals told the plaintiff that FCI Berlin staff do not follow CDC guidelines. To the contrary on October 16, 2020, two inmates at FCI Berlin, indeed, tested positive for COVID-19. Warden Robert Hazelwood and FCI Berlin staff acted reasonably and diligently in recalling the institution in order to "conduct contact trancing and perform additional testing of inmates." The inmate population at FCI Berlin was remained about the extreme importance in following established protocols of "sanitation, social distancing, and the wearing of face masks." See FCI Berlin Inmate Bulletin Positive COVID-19 Cases, October 16, 2020. Warden Robert Hazelwood and Berlin staff continued to take reasonable and diligent actions in placing the institution into quarantine status, "so that we can stop the spread of the virus. Contact tracing is underway and all inmates will be tested for COVID-19 in the coming days. These measures are being undertaken to protect everyone's health and safety." See FCI Berlin Inmate Bulletin COVID-19 —

10.

Institution Update, October 17, 2020. As a result of Warden Robert Hazelwood and FCI Berlin staff taking reasonable and diligent actions to include contact **tracing** and isolation of FCI Berlin inmates only eight (8) inmates tested positive for COVID-19 at that time. "These measures are in place to ensure the virus does not gain a foothold at FCI Berlin and to protect everyone's health and safety." See FCI Berlin Inmate Bulletin Institution Update, October 23, 2020.

29. The actions of Clinical Director _____ and Health Service Administor Mrs. T. Cinkovich as set forth in paragraph 23 constitute <u>negligence</u> in violation of New Hampshire law. According to the Federal Bureau of Prisons (FBOP) Program State-ment, the health services administrator and clinical director <u>are responsible</u> "for the operation of the institution's infection disease program in accordance with applicable laws and regulations." Moreover, it was the health services administor's responsibility to provide, "[i]nfectious disease procedures written in accordance with this Program Statement and other Bureau policy." See Program Statement #6190.04, §549.11. Both the clinical director and health services administrator neglected their responsibilities pursuant to said policy to ensure that the infectious disease procedures <u>written by the health</u> services administrator in accordance with Bureau policy operated according to the procedures perscribed therein in regards to the keeping of everyone here at FCI Berlin safe from exposure to COVID-19. The health services administrator and clinical director failed to ensure that FCI Berlin staff including medical personal operated according to the infectious disease procedure regarding COVID-19, because they failed to ensure that contact tracing was done and isolation protocals were followed to protect the inmate population until well over one hundred and fifty (150) inmates, including the plaintiff, had contract the COVID-19 virus. See FCI Berlin Inmate Bulletin COVID-19 — Institution Update, October 17, 2020, and FCI Berlin Inmate Bulletin COVID-19 update, April 15, 2021. To be clear the health services administrator and clinical director completely failed to ensure that the procedure of

11.

Contact tracing was followed. As a direct result, the plaintiff was exposed to and contracted COVID-19 that caused him weakness, head aces, and shortness of breath. The health services administractor and the clinical director had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff from exposure to the COVID-19 virus which was known to or which might reasonably be apprehended by them. See 18 U.S.C. §4042.

30. The actions of Register Nurse (RN) Mrs. Recon as set forth in paragraph 6 and paragraph 9 constitute negligence in violation of New Hampshire law. The RN had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff from exposure to COVID-19 which was known to or which might reasonably be apprehended by her. See 18 U.S.C. §4042. Between April 1, 2021, and April 8, 2021, I/M Jaiden Paige informed the RN that he was sick on the first occassion. The RN told I/M Jaiden Paige that she would put him on call-out to be seen by medical staff. However, I/M Jaiden was never put on the call-out and was never seen by medical personal. I/M Jaiden Paige got progressively sicker while waiting to be called out to health services. On the second ocassion I/M Jaiden Paige specifically told the RN that he believed he had COVID-19 while retrieving his medication at the pill line window. The RN informed I/M Jaiden Paige that there was no one from medical available to test him for COVID-19. I/M Jaiden Paige then returned to Unit A-1. On April 9, 2021, it was determined that I/M Jaiden Paige, indeed, was sick with COVID-19. RN Mrs. Recon failed to follow the the mandatory health and safety precautions which included testing and admitting I/M Jaiden Paige in quarantine to keep the plaintiff from being exposed to COVID-19. "We must continue our infection control procedures to keep the virus out of this institution. Although the majority of the inmate population has been cooperative in following these mandatory health and safety precautions, we must have the cooperation of everyone,...." See FCI Berlin Inmate Bulletin COVID-19 Update, August 25, 2020.

31. The actions of Register Nurse (RN) Mrs. Girard as set forth in paragraph 9, 11 and 23 constitute negligence in violation of New Hampshire law. The RN had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff from exposure to the COVID-19 virus which was known to or which might reasonably be apprehended by her. See 18 U.S.C. §4042. The RN failed to exercise reasonable care and diligence to protect the plaintiff from exposure to COVID-19, because the RN begain conducting COVID-19 test on the inmates of Unit A-1 April 10, 2021, through April 14, 2021, and although the majority of the inmates were testing positive for COVID-19 the RN failed to conduct contact tracing and isolation whatsoever until the plaintiff along with about eleven other inmates were placed in isolation on April 14, 2021, which at such time the plaintiff had already contracted COVID-19 and was suffering from its effects. FCI Berlin adobted "infection control procedures to keep the virus out of this institution" and the "infection control procedures" were "mandatory health and safety precautions." See FCI Berlin Inmate Bulletin COVID-19, Update August 25, 2020. Contact tracing and isolation for inmates who were exposed to COVID-19 were apart of the "mandatory health and safety precautions." See FCI Berlin Inmate Bulletin COVID-19 - Institution Update, October 17, 2020.

32. The actions of C/O A. Lavoie as set forth in paragraph 13 constitute negligence in violation of New Hampshire law. C/O A. Lavoie had a duty to the plaintiff to exercise reasonable care and diligence to protect the plaintiff from exposure to the COVID-19 virus which was known to or which might reasonably be apprehended by him. See 18 U.S.C. §4042. C/O A. Lavoie worked as the correctional officer in Unit A-1 and Unit B-3 during the widespread outbreak of COVID-19 among the inmates from April 9, 2021, through May of 2021. C/O A. Lavoire had a duty prescribed upon him to adhere to the mandatory health and safety precautions to keep the virus out of FCI Berlin. See Supra. C/O A. Lavoie failed to preform contact tracing and isolation of inmates he knew came into contact with other inmates that tested positive for COVID-19.

13.

As a result, the Covid-19 virus was allowed to spread which exposed the plaintiff to the virus.

### Discretionary-Function-Exception Is Non-Applicable

33. " A court analyzes discretionary-function-exception problems this way. After identifying "the conduct that supposedly caused the harm," the court asks two possible questions. See Mahon, 742 F.3d at 14. The first question is whether the conduct can be called "discretionary." Id. Conduct cannot be called discretionary if a federal "'statute, regulation, or policy' actually dictates 'a course of action'" - because in that scenario, the federal employee "has no choice but to follow the 'directive.'" Id. (quoting Berkovitz v. United States, 486 U.S. 531, 531, 108 S.Ct. 1954, 100 L.Ed. 2d 531 (1988)). The second question (asked only if the conduct involves an element of discretion) is whether "' the exercise or non-exercise of the granted discretion is actually or potentially' affected by" legitimate "policy-related judgments," id. (quoting Fothergill v. United States, 566 F.3d 248, 252 (1st Cir. 2009)) - the "or potentially" jargon means the complained-of "acts or omissions" need only be "susceptible to a policy-driven analysis," regardless of whether they actually were, See Evans v. United States, 876 F.3d 375, 383 (1st Cir. 2017)( quoting Shansky v. United States, 164 F.3d 688, 692 (1st Cir. 1999)). Also and importantly, when a federal statute, regulation, or policy lets a government agent exercise discretion, a court presumes the agent's acts involve policy. See United States v. Gaubert, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1988); Bolduc v. United States, 402 F.3d 50, 60 (1st Cir. 2005). If the answer to each question is yes, the discretionary-function exception applies and the sovereign-immunity doctrine precludes suit on the at-issue claims. See Mahon, 742 F.3d at 14. But if the answer to either question is no, the exception does not apply and the claims may proceed. See id." See Reyes-Colón v. United States, 974 F.3d 56, 58-59 (1st Cir. 2020).

34. The conduct that caused the plaintiff to be exposed to COVID-19 in which he contracted the virus and was injuried was FCI Berlin employees dereliction of their duty to the plaintiff, a prisoner, to exercise reasonable care and diligence to protect the plaintiff from exposure to COVID-19 which was known to or which might reasonably be apprehended by them. See 18 U.S.C. §4042. The conduct of FCI Berlin employees cannot be called discretionary, because regulation or policy dictated the course of action. Therefore, FCI Berlin employees had no choice but to follow the directive of the mandatory health and safety precautions. See FCI Berlin Inmate Bulletin COVID-19 Update, August 25, 2020.

35. On October 16-17, 2020, FCI Berlin exprienced its first cases of COVID-19 among the inmate population. FCI Berlin employees took reasonable and diligent action to include contact tracing among the inmate population, because it was part of the measures that FCI Berlin employees undertook to protect everyone's health and safety. See FCI Berlin Inmate Bulletin COVID-19 — Institution Update, October 17, 2021.

36. "The BOP has developed a multi-point plan to address the COVID-19 pandemic, which has been implemented at FCI Berlin. Under the plan, the BOP has established quarantine and isolation protocols, screening and sanitization procedures, social distancing during visits, daily temperature checks, and mask wearing for staff and inmates, among other measures. See, e.g., Ex. 1 to Gov't's Objection to Def.'s Request for Preliminary Relief, Doc. No. 9-1. As of May 21, 2021, there were zero active cases of COVID-19 among the inmates and four active cases among the staff at FCI Berlin." See Mateo v. Warden, Fed. Corr. Inst., 2021 DNH 089, 2021 U.S. Dist. LEXIS 98383, pg. 3 (DNH., May 24, 2021).

37. As acknowledged by the District Court of New Hampshire pursuant to the government's Exhibit 1, FCI Berlin implemented a multi-point plan to address the COVID-19 virus

that established isolation protocals, inter alia. Hence, FCI Berlin employees had no other choice but to follow the protocals established by the BOP.

38. The conduct of FCI Berlin employees did not involved an element of discretion. The protocals establised by the BOP to address COVID-19 and implemented at FCI Berlin were, indeed, mandatory health and safety precautions. See FCI Berlin Inmate Bulletin COVID-19 Update, August 25, 2020.

Constitutional Claims Against Warden Robert Hazelwood, Assistant Warden, T. Steals, Assistant Warden D. Ramierz, Clinical Director _____, Health Service Administrator T. Cinkovich, Register Nurse Mrs. Recon, Registere Nurse Mrs. Girard Correctional Officer A. Lavoie and Lieutenant C. McCormick.

(Bivens Claim)

39. "A prisoner seeking to exhaust his administrative remedies under the PLRA must complete the administrative review process that is available at his correctional facility in accordance with the procedural rules of the facility... To succeed on an affirmative defense of failure to exhaust remedies, the government must demonstrate that no reasonable jury could find that the plaintiff exhausted the remedies that were availebe to him. See Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)... If the government shows that the plaintiff failed to exhaust the remedies that were generally available, the burden shifts to the plaintiff to provide evidence showing that something in his case made those generally available remedies unavailable to him. Albino, 747 F.3d at 1172." See Collins v. FCI Berlin Warden, 2021 U.S. Dist. Lexis 129155, pg. 10-11 (D.N.H., June 15, 2021)(omissions added).

40. In Ngo, the Supreme Court rejected the idea... that a process becomes

unavailable because the prisoner does not comply with the procedural rules and therefore cannot obtain relief, and required courts to look at the reason why the administrative process is unavailable," Kaba, 458 F.3d at 684 (quoting Ngo, 126 S.Ct. at 2387, 2392-93))... On the other hand, when prison officials prevent inmates from using the administrative process, that process becomes unavailable. Id. (citing Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004).... " See Wolf v. N.H. Dep't of Correction, 2066 U.S. Dist. LEXIS 77394, pg. 5-6 (D.N.H., Oct. 19, 2006)(omissions added).

41. The procedural rules for the FBOP required that the plaintiff submit his administrative remedy BP-9 request within 20 days of the event complained about. On May 3, 2021, the plaintiff filed a BP-8 administrative remedy against CIO A. Lavoie and a BP-9 administrative remedy request against the same CIO pursuant to the events alleged in paragraphs 12-22. On May 17, 2021, the administrative remedy Clerk rejected the plaintiff's administrative remedy BP-9 request for untimelyness. See Attachment.

42. On May 6, 2021, the plaintiff submitted an administrative remedy BP-8 request against Lieutenant A. McCormick and an administrative remedy BP-9 request against the same lieutenant pursuant to the events alleged in paragraphs 15-21. On May 21, 2021, the administrative remedy Clerk rejected the plaintiff's administrative remedy BP-9 request for untimelyness. See Attachment.

43. With the exception of the warden, see Attachment, the plaintiff did not submit any administrative remedy request against the remaining FCI Berlin employees named in this complaint, because it became apparent to the plaintiff that the prison officials prevented him from using the administrative process.

44. From April 9, 2021, through April 15, 2021, the events alleged in paragraphs 6-23

were constantly evolving. On April 15, 2021, the plaintiff was placed in Unit C-4 for the purpose of quarantine. Although the plaintiff was suffering from the ill effects from COVID-19, he desired to submit his administrative remedy request against the FCI Berlin employees alleged in this complaint. However, the plaintiff was not able to bring the administrative remedy request that he had in his personal property to Unit C-4, because he was not allowed to bring any documents to the quarantine unit. Therefore, the plaintiff had to wait for someone to come to Unit C-4, in particular, a member of his unit team to provide him with the administrative remedy forms. No staff member ever came to Unit C-4 or Unit C-2 from the plaintiff's unit team. Therefore, the plaintiff was not able to acquire the administrative remedy forms from his unit team staff members or from any staff members belonging to other units.

45. On April 26, 2021, the plaintiff was removed from the quarantine unit and placed in the Special Housing Unit (SHU). Mrs. D. Shuler, Case Manager, was working as a SHU officer. The plaintiff request of Mrs. D. Shuler, Case Manager, to provide him with the administrative remedy forms that he needed, but she told the plaintiff that she is not working as a case manager while in the SHU and, therefore, she does not have the documents with her.

46. Between April 26, 2021, and May 2, 2021, the plaintiff complained to Assistant Warden T. Steels and Assistant Warden D. Ramierz that he needs administrative remedy forms and no member of his unit team will visit with him as to avoid having to give him the forms. On that particular day in question Mrs. Cairns, Case Management Coordinator, noted the plaintiff complaint and told the plaintiff, "someone from your unit team will be here to see you." No member of the plaintiff's unit team came to see him in the SHU from April 26, 2021, through May 4, 2021.

47. On April 29, 2021, the plaintiff saw Mrs. A. Ferron, Case manager, from another

18.

Unit walking down E-Range while in the SHU and asked her could he have an administrative remedy BP-8. She gave the plaintiff his two BP-8 request form to which he filed against CIO A. Lavoie as dated May 3, 2021. See Attachment. The plaintiff could not immediately give the administrative remedy BP-8 form to a staff member who could process his complaint, because he was confined to the SHU and it was not until May 5, 2021, that Mrs. D. Shuler, Case Manager, visited with him in the SHU as his case Manager. See Supra. The plaintiff did not recieve a response from his BP-8 request until May 14, 2021, and at such time he requested an administrative remedy BP-9 from Mrs. R. Cruz, Counselor, and returned it to her on the same day. See Supra. However, the plaintiff administrative remedy BP-9 request was deemed untimely.

48. On May 5, 2021, Mrs. D. Shuler, Case Manager, visited the plaintiff in the SHU as his case Manager for the first time after being admitted in the SHU. The plaintiff requested that he be given an administrative remedy BP-8 to which he recieved and complained about the action of Lieutenant A. McCormick by way of that BP-8 request dated May 6, 2021. See Attachment. The plaintiff continued with this administrative process against Lieutenant A. McCormick until May 21, 2021, when the administrative Clerk rejected his administrative remedy BP-9 request as untimely. See Supra.

49. Between April 26, 2021 and May 17, 2021, the plaintiff did gave Mr. Kelly, Counselor, the second administrative BP-8 request form that he recieved from Mrs. A. Case Manager, that was filed against Lieutenant McCormick prior to refiling another BP-8 against the lieutenant as demonstrated in paragraph 48. Due to the fact that the plaintiff did not recieve a response pursuant to the initial BP-8 filed against the lieutenant, the plaintiff filed the administrative remedy BP-9 request on May 14, 2021, and was rejected by the administrative remedy Clerk for not recieving a response as to the BP-8 initially filed against the lieutenant. See Attachment. Mr. Kelly, Counselor, was from another unit other than the plaintiff's unit.

19.

50. According to the extension of time approved by the warden given to Ms. R. Langley, Counselor, to conduct the plaintiff's Unit Disciplinary Committee (UDC) proceedings in the absence of Mr. Cairns, Unit Manager, Mrs. O. Shuler, Case Manager, and Mrs. R. Cruz, Counselor, who were the plaintiff's unit team members; the plaintiff's unit team members were unavailable from April 15, 2021, through May 4, 2021, because the plaintiff's unit team was augmented and unavailable to the plaintiff.

51. Therefore, since the plaintiff did not have meaningful access to his unit team he did not have meaningful access to the administrative remedy forms in a timely manner. Furthermore, not recieving a response to at least one of his administrative remedy BP-8 contributed to a failed attempt to exhaust his administrative remedies. Consequently, the prison officials at FCI Berlin prevented the plaintiff from using the administrative process. Therefore, that process became unavailable to the plaintiff.

52. In addition, the plaintiff noted in his Administrative Claim for Damage, injury or Death, to the United States __Federal Bureau of Prisons_____, Department of __Justice_____ on pages 4, last paragraph through page 5, first paragraph that his unit team would not give him grievances (administrative remedy forms).

53. "Conditions-of-Confinement claims are assessed under the "deliberate indifference" framework. Farmer, 511 U.S. at 828. This standard has both an objective and a sub-jective prong. Id. at 834. The objective prong requires the prisoner to "show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. (citing Helling v. Mckinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed. 2d 22 (1993)). The subjective prong requires a showing that prison officials acted with "deliberate indifference" to that risk, id., meaning that they had "actual knowledge of impending harm, easily pre-ventable, and yet failed to take the steps that would have easily prevented that harm." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018)(internal quotation marks and

citation omitted); see Farmer, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substaintial risk of serious harm exists, and he must also draw the inference."). The requisite mental state is akin to criminal recklessness, "characterized by obduracy and wantonness, not inadvertence or error in good faith." Leite v. Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (internal quotation marks omitted); see Giroux, 178 F.3d at 32. Assuming, without deciding, that Mateo could satisfy the objective prong of his Eight Amendment Claim, which is doubtful, see supra note 4, he has not demonstrated a likelihood that the Warden has been obdurate, wonton, or reckless with respect to the risk that COVID-19 presents to those detained at FCI Berlin or has otherwise failed to take reasonable steps aimed at preventing or mitigating that risk. At this facility, the BoP has implemented a number of measures and policies in response to the COVID-19 pandemic, including quarantine and isolation protocols, screening and sanitization procedures, social distancing, and mask wearing." See Mateo v. Worden, Fed. Corr. Inst., 2021 DNH 089, 2021 U.S. Dist. LEXIS 98383, pgs. 6-8 (D.N.H., May 24, 2021).

54. The plaintiff has demonstrated that between April 9, 2021, through April 15, 2021, he was incarcerated under conditions posing a substantial risk of serious harm due to exposure to the COVID-19 virus set forth in paragraphs 6-21.

55. The actions of Warden Robert Hazelwood as set forth in paragraph 16 and 23 violated the plaintiff's Eight Amendment right to be provided with humane conditions of confinement. As part of this duty, the warden was obligated to "take reasonable measures to quarantee the health and safety of the plaintiff. The warden failed to conduct contact tracing in accordance with FCI Berlin's measures and policies in response to the widespread COVID-19 outbreak that begain at the facility on April 9, 2021. The warden waited until over one hundred and fifty (150) inmates tested positive for COVID-19, including the plaintiff, before isolating the inmates that was exposed to

21.

the COVID-19 virus. See FCI Berlin Inmate Bulletin COVID-19 Update, April 15, 2021.

56. The actions of Assistant Warden T. Steals and Assistant Warden D. Ramierz as set forth in paragraphs 20 and 23 violated the plaintiff's Eight Amendment right to be provided with humane conditions of confinement. As part of this duty, the assistant wardens were obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. The assistant wardens failed to take any step aimed at preventing or mitigating the risk of COVID-19 to the plaintiff pursuant to the widespread COVID-19 outbreak that begain at this facility on April 9, 2021. The assistant wardens failed to conduct or enforce FCI Berlin's measures and policies that the facility put in place in response to the COVID-19 virus. The assistant wardens conducted a walk through of the quarantine unit in response to the COVID-19 widespread outbreak after one hundred and fifty (150) inmates, including the plaintiff, had tested positive for COVID-19.

57. The actions of Clinical Director _____ and Health Service Administrator T. Cinkovich as set forth in paragraph 23 violated the plaintiff's Eight Amendment right to be provided with humane conditions of confinement. As part of this duty, the clinical director and health service administrator were obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. According to FBOP Program Statement, it was the specific duty of the health service administrator and clinical director to assume the responsibility "for the operation of the institution's infection disease program in accordance with applicable laws and regulations." See Program Statement #6190.04, §549.11. The New Hampshire District Court has since acknowledged that, "[t]he BOP has developed a multi-point plan to address the COVID-19 pandemic, which has been implemented at FCI Berlin. Under the plan, the BOP has established quaratine and isolation protocols...among other measures. See, e.g., Ex.1 to Gov't's Objection to Def.'s Request for Preliminary Relief..." See Mateo v. Worden, Fed. Corr. Inst., 2021 DNH 089, 2021 U.S. Dist. LEXIS 98383, pg. 3 (DNH., May 24, 2021). The health service administator and clinical director failed to

22.

assume the responsibility to conduct or enforce the BOP's multi-point plan as to contact tracing and isolation of inmates who had been exposed to the COVID-19 virus. As a result, the plaintiff was exposed and did contracted the virus and suffered from its effects.

58. The actions of Register Nurse Mrs. Recon as set forth in paragraphs 6, 9 and 23 violated the plaintiff's Eight Amendment right to be provided with humane conditions of confinement. As part of this duty, the RN was obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. The RN failed to have I/M Jaiden Paige placed on the call-out to be seen by medical staff when he first told the RN that he was sick. I/M Jaiden Paige again on a second occassion informed the RN that he was sick and that he believes that he had COVID-19. However, the RN told I/M Jaiden Paige that there was not anyone at the facility to test him for COVID-19. As a result, I/M Jaiden Paige was allowed to return to the unit and expose the plaintiff and other inmates to COVID-19. The RN failed to take any step aimed at preventing or mitigating the exposure and risk of COVID-19 to the plaintiff. The RN failed to enforce contact tracing and isolation of inmates who were directly exposed to COVID-19.

59. The actions of Register Nurse Mrs. Girard as set forth in paragraphs 9, 11, 16 and 23 violated the plaintiff's Eight Amendment right to be provided with humane conditions of confinement. As part of this duty, the RN was obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. The RN failed to take any step aimed at preventing or mitigating the exposure and risk of COVID-19 to the plaintiff. The RN failed to enforce contact tracing and isolation of inmates who were directly exposed to COVID-19 until after over one hundred and fifty inmates, including the plaintiff, had tested positive for COVID-19. See FCI Berlin Inmate Bulletin COVID-19 Update, April 15, 2021.

60. The actions of C/O A. LaVoie as set forth in paragraphs 13-14 and 23 violated the

plaintiff's <u>Eight Amendment</u> right to be provided with humane conditions of confinement. As part of his duty, the CIO was obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. The plaintiff was sick with COVID-19 which prompted him to activate his inmate duress alarm to request of CIO A. Lavoie assistance. Not only did CIO A. Lavoie failed to render any <u>medical assistance</u> to the plaintiff, he issued the plaintiff an incident report for activating the duress alarm to inquire medical assistance. See Incident Report Attached.

61. The actions of Lieutenant A. McCormick as set forth in paragraph 14 and 23 violated the plaintiff's <u>Eight Amendment</u> right to be provided with humane conditions of confinement. As part of his duty, the lieutenant was obligated to "take reasonable measures to guarantee the health and safety of the plaintiff. The plaintiff told the lieutenant that he was sick and that he needed medical attention, but the lieutenant simply threaten to have the plaintiff placed in SHU for complaining about the need for medical assistance.

62. The plaintiff has meet his burden of showing that he was incarcerated under conditions that posed a substantial risk of serious harm. Thus, satisfying the objective prong.

63. FCI Berlin employees acted with "deliberate indifference" to the risk of being exposed to COVID-19 as to the plaintiff and the inmates at that facility. FCI Berlin employees had actual knowledge of the widespread COVID-19 outbreak that occurred at FCI Berlin that begain on April 9, 2021, and continued through April 14, 2021. FCI Berlin employees failed to take the steps that they took to easily prevent the plaintiff from being exposed to COVID-19 and contracting the virus as they did in paragraphs 24 and 25. See FCI Berlin Inmate Bulletin Positive COVID-19 Cases, October 16, 2021, and FCI Berlin Inmate Bulletin COVID-19 — Institution Update,

24.

October 17, 2020.

64. The plaintiff has meet his burden of showing that FCI Berlin employees acted with "deliberate indifference" to the risk that exposure to COVID-19 had on the plaintiff and the inmates at that facility.

## Prayer for Relief

A. On the claims stated in paragraphs 26-32, the plaintiff asks the Court to enter judgment against defendant United States of America and to hold the defendant United States of America liable to the plaintiff for compensatory damages in the amount of #250,000.00 for the actual physical injury of contracting COVID-19 and for the plaintiff pain and suffering caused by contracting COVID-19.

B. For the injuries that plaintiff suffered as a result of the claims stated in paragraphs 55-61, the plaintiff asks the Court to hold Warden Robert Hazelwood, Assistant Warden T. Steals, Assistant Warden D. Ramierz, Clinical Director, , Health Service Administrator T. Cinkovich, Register Nurse Mrs. Girard, Register Nurse Mrs. Recon, Correctional Officer A. Lavoie and Lieutenant A. McCormick Severally liable in their individual capacity (personally) for compensatory damages and for pain and suffering caused by their actions in the amount of #50,000.00 each.

## Jury Demand

Plaintiff demand a jury trial on his constitutional claims against Warden Robert Hazelwood, Assistant Warden T. Steals, Assistant Warden D. Ramierz, Clinical Director,

25.

, Health Service Administrator T. Cinkovich, Register Nurse Mrs. Girard, Register Nurse Mrs. Recon, Correctional Officer A. Lavoie and Lieutenant A. McCormick.

Date : August 10, 2021

26.

CERTIFICATE OF SERVICE

I, Arthur Jones, Jr., hereby certify that I have served a true and correct copy of the foregoing: Complaint For Damages which is deemed filed at the time it was delivered to prison authorities for forwarding to the court, Houston vs. Lack, 101 L.Ed. 2d 245 (1988), upon the court and parties to litigation and/or his/her attorney (s) of record, by placing same in a sealed, postage prepaid envelope addressed to : Clerk of the Court, U.S. District Court

Warren B. Rudman U.S. Courthouse.

55 Pleasant Street, Room 110, Concord, NH 03301-3941

and deposited same in the United States Postal Mail at Federal Correctional Institution Berlin, Signed on this __10th__ day of __August__ 2022.

Respectfully Submitted,

Arthur Jones, Jr.

Arthur Jones, Jr.

Reg. No. 95635-071

FCI Berlin

P.O. Box 9000

Berlin, NH 03570